## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 3:19-cr-00046 |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **ON DEFENDANT'S MOTION TO** |
| CURTIS LEE SMITH, | ) | **SUPPRESS** |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter comes before the Court pursuant to the Motion to Suppress Evidence and Request for Evidentiary Hearing (Dkt. No. 21) and supporting brief (Dkt. No. 21-1) filed by Curtis Lee Smith ("Defendant") on August 6, 2019. The Government resisted the motion on September 3, 2019. Dkt. No. 39. This matter was referred to this Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for report and recommendation by Chief Judge John A. Jarvey on August 19, 2019. Dkt. No. 33. Trial is set for November 4, 2019. Dkt. No. 32.

An evidentiary hearing was held on September 16, 2019. The Government appeared by Assistant U.S. Attorney William Ripley. Defendant appeared personally and with his attorney, Assistant Federal Defender Diane Z. Helphrey. The Court received Government's Exhibit 1 – a video of Defendant's interview; Government's Exhibit 2 – Defendant's *Miranda* form and Government's Exhibit 3 – a screenshot from Detective Aric Robinson's body camera video. The Court also received Defendant's Exhibit A – a search warrant (under seal); Defendant's Exhibit B – the search warrant return (under seal); Defendant's Exhibit C – Officer Joe Regan's body camera video; Defendant's Exhibit D – Detective Jason Ellerbach's body camera video; Defendant's Exhibit E – a second body camera video for Officer Joe Regan and Defendant's Exhibit F – Officer Luna's

rear squad car camera video. Officer Joe Regan, Detective Jason Ellerbach, Detective Aric Robinson, and Detective Brian Morel all of the Davenport Police Department testified. The Government filed a supplemental resistance to the motion on September 15, 2019. Dkt. 40. Defendant submitted a response to the supplemental resistance on September 23, 2019.  Dkt. No. 43. The matter is now fully submitted.

This Magistrate Judge has carefully considered the record evidence, the arguments and statements of counsel and submits the following report.  As set forth below, based on the facts presented and applicable law, it is recommended that the motion be denied.

## I. FINDINGS OF FACT

Defendant was indicted on May 8, 2019, on three counts: 1) possession with intent to distribute marijuana, in violation of 21 U.S.C.  §§ 841(a)(1) and 841(b)(1)(D); 2) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and 3) felon in possession of firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Dkt. No. 1. A superseding indictment was filed on August 8, 2019 for the same counts, to conform to the requirement laid out by the Supreme Court in *Rehaif v. United States*, —— U.S. ——, 139 S. Ct. 2191, 204 L.Ed.2d 594 (2019), that Defendant knew of his status. Dkt. Nos. 25, 28.

These charges arose from a 911 call to police on January 25, 2019 by an individual reporting the mother of his children had contacted him and told him she was being held against her will by a man with a gun in room 220 at the QC Inn, Davenport, Iowa.

Officer Regan, a member of the Davenport Police Department for eleven years, testified as to his response to this 911 call and what transpired at the QC Inn that day. He was on duty by himself, working the day shift and recalled the day to be sunny, but very cold with windchills below zero. The

911 call came at approximately 8:00 a.m. from a third party, reporting he had received a message from his child's mother that she was being held against her will at the QC Inn by a man with a gun and was unable to leave. Officer Regan testified the caller had only given the first name of the child's mother which seemed odd to him.

The QC Inn is located at 6111 North Brady Street in Davenport, Iowa. It is a two-story structure in a "T" shape with one row of rooms running east to west and the other running north to south. The floors are split by a staircase with twenty rooms to each side of the staircase and lengthy hallways. The door to each room opens to the outside.

Along with Officer Regan, Officers Dinneweth and Luna of the Davenport Police Department responded to the QC Inn. Upon arriving, Officer Regan checked with the front desk clerk to see who was registered to room 220. He was not able to identify the name of the person registered to room 220 but did learn there were people staying in that room.

The officers went to room 220 on the second floor and knocked several times on the door. Officer Regan instructed the other officers to stay away from the door as much as possible because the 911 call referenced a gun. There was no response at first, but eventually a woman, later identified as Raynesha Amling, came to the door. Ms. Amling was wrapped in a blanket, she said she had fallen asleep and she was fine. The officers did not note any visible signs of abuse or assault to Ms. Amling. Almost immediately, Ms. Amling called the father of her child, and became loud and belligerent stating she would be arrested pursuant to an outstanding warrant because of his call to the police. Officer Regan testified she was so loud, officers had trouble obtaining her name from her. Eventually, officers took Ms. Amling's phone from her in order to communicate with her.

Because Officer Regan noted there was a male present in room 220, he moved Ms. Amling away from the room to speak with her. There was confusion regarding Ms. Amling's name and its spelling due to her being loud and belligerent. Officer Regan received her identification information second-hand from another officer who had arrived on scene, but her name was misspelled. Due to this, no outstanding warrant was located for Ms. Amling and Officer Regan told her of this. Ms. Amling informed Officer Regan she planned to leave the room and had an Uber ride coming. Ms. Amling then went back into room 220.

Because Ms. Amling had informed the officers she was fine and she was leaving, Officer Regan indicated he had no reason to look for a gun. However, Officer Regan was clear in his testimony that, simply because he did not have cause to further the investigation into the room, this did not mean there was not a gun in room 220. Officer Regan further testified domestic calls often play out as this incident did with information changing throughout the course of the investigation.

Consequently, officers began to walk away from the area. Before reaching their squad cars, they were contacted by Detective Brian Butt of the Davenport Police Department who informed them he knew Ms. Amling and she did, in fact, have an active warrant for a charge of false information to law enforcement. Detective Butt also informed the officers the male in room 220 was Defendant, he had been involved in a previous shots fired gun call to the Davenport Police Department but there was no arrest warrant as Defendant had charges waiting for approval. Detective Butt instructed the officers to wait at the QC Inn.

Officers Dinneweth and Luna had not lost sight of room 220 and positioned themselves on the second floor of the hallway balcony on the east side of the QC Inn. While they waited for the

detectives to arrive, Ms. Amling exited room 220. She was immediately taken into custody for the outstanding warrant and placed in the rear of a squad car.

Officer Regan testified he was waiting for the detectives to arrive and planned to follow their lead. At that point, he was focused on not letting anyone leave room 220 and planned to detain anyone who came out. He was being cautious about not getting too close to the room because of the possible gun. Officers Dinneweth and Luna knocked on the door of room 220 a few times and asked Defendant to come out. Officer Regan told the officers to back away from the room because he did not know Defendant and did not know if Defendant was going to shoot. Eventually, Officers Dinneweth and Luna moved away from room 220 and detectives from the Davenport Police Department arrived shortly thereafter. Officer Regan was informed by Detective Ellerbach Defendant had active charges.

Officers discussed going to room 220 and using a ruse to get Defendant to open the door in order to take him into custody. The plan was then to wait for a search warrant to search room 220. The officers agreed to have their guns out but down and to do a felony crime stop if the opportunity presented itself. Officer Regan stated, although his written report indicated Defendant would be taken into custody, the plan at the scene was only to detain him.

Detective Ellerbach testified he was concerned for officer safety as well as evidence destruction. He discussed concerns regarding evidence destruction, stating that it is a common concern in many investigations. As this is a common concern, Detective Ellerbach indicated it is not always put in a report and was not in this case. Detective Ellerbach stated he knew of a social media post made by Defendant indicating Defendant possessed guns and marijuana. Detective Ellerbach

knew Defendant was in room 220 and he knew Defendant was going to be charged for the prior shots fired incident.

Between three to five minutes after Officers Dinneweth and Luna left the area near room 220, officers again approached the door of room 220. Officer Regan lightly knocked on the door. He testified it was not a "police knock". Defendant opened room 220's door right way and was approximately one foot inside the doorway. Although no order had been given, he held his hands in the air. Officers went inside the room, handcuffed and searched Defendant. Defendant had $2060.00 in currency in his right hand, which was placed on a table in room 220. Defendant was shirtless but wearing shorts and sweatpants. He was given a zip up sweatshirt jacket to wear and placed in a squad car. Based upon his demeanor and behavior, officers did not observe any signs of Defendant being under an impairment or under the influence of drugs or alcohol.

Detective Ellerbach testified officers searched the room for limited purposes - to determine if other people were there for officer safety and to prevent destruction of evidence. A full search of the room was not undertaken as the search warrant had not been signed yet.

Detective Morel was tasked with drafting the search warrant. He is the lead investigator into an October 20, 2018 shooting in which Defendant is a target. He testified Detective Butt discovered a social media posting, a week earlier, showing Defendant in possession of firearms and marijuana. The importance of this post to Detective Morel is it indicated Defendant was in the area. Detective Morel did not put the information about the post in the search warrant because he did not want to divulge the strategy used to find the information. Detective Morel testified the factual support for the search warrant affidavit included details from the January 25, 2019 911 call but it did not contain

information the officers had ceased any investigation at the scene. Rather, Detective Morel indicated the information from the 911 call was only to put Defendant in room 220 at the QC Inn.

Once Detective Morel contacted Detective Ellerbach to advise him the search warrant had been signed, officers conducted a full search of room 220. During the search, detectives located several items of evidentiary value including 128.4 grams of marijuana, packaging items, $2060.00 in currency, a cellphone, a loaded Ruger .380 caliber pistol, a loaded Lorcin .380 caliber pistol, and a Taurus .45 caliber pistol. Detectives also discovered two empty magazines, eighteen rounds of .380 caliber ammunition and sixty-four rounds of .22 caliber ammunition. The firearms, ammunition, and marijuana were found in the ceiling vent of room 220. In addition, detectives recovered a black duffel bag in room 220 which contained an identification card for Defendant, an LG cellular phone, two rounds of .380 ammunition, a digital scale, twelve small plastic Ziploc bags containing marijuana residue, and four mason jars containing marijuana residue.

During the search of room 220, Detective Robinson noticed what appeared to be a bullet hole in one of the walls. The wall is a shared a wall with room 219. He contacted the person staying in room 219 who identified herself as Jennifer Allred. Ms. Allred confirmed a gunshot entered her room a few days prior. She allowed Detective Robinson into her room where he observed several bullet holes in the wall. Ms. Allred indicated she stuffed the holes with toilet paper and had repositioned her bed because of the gunshots. She did not identify the exact day of the gunshot, but said on the day the gunshot happened, she went outside her room after the gunshot and encountered a woman named Carley and a man leaving room 220. She asked the man about the gun shot. Ms. Allred said Carley said something about it coming from a BB gun, but Ms. Allred did not believe

her. The man asked her if she was ok and allowed her to make a phone call to the front desk using the phone in room 220. Ms. Allred said Carley and the man had been in room 220 for several days.

Detective Robinson retrieved a mugshot photograph of Defendant on his cell phone from another officer. He showed Ms. Allred the photograph and she identified it as the man who had left room 220 after the gunshot entered her room. Detective Robinson did not recall what he told Ms. Allred during this interaction, nor did she identify how much contact she had had with Carly or the man in room 220. Detective Robinson did not ask Ms. Allred for a description of the man in room 220 prior to showing her the photograph of Defendant, but indicated she identified the photograph as being the exact person and she did so without hesitation.

On January 25, 2019, Detective Morel met with Defendant to interview him in a recorded interview room at the Davenport Police Department. Prior to that meeting, Detective Morel met with Ms. Amling for an interview on the same day. During his meeting with her, Defendant could be heard yelling, in Detective Morel's view, to get Ms. Amling's attention. Detective Morel testified he believed Defendant was aware of the investigation into the October 20, 2018 shooting incident. Defendant wanted to know why he was in custody, which Detective Morel did not respond to. Detective Morel confirmed it is not unusual to not tell someone why they are in custody. Detective Morel told Defendant to stop yelling. When Defendant said he wanted to talk, indicating so both verbally and nonverbally by taping the table, Detective Morel went through a *Miranda* waiver form with Defendant.

Detective Morel was not concerned when Defendant said he did not understand what was going on because Defendant understood the basic instructions given to him, initialed the right lines on the *Miranda* form and was quick to state he had completed the eleventh grade. From his prior

experience, Detective Morel stated he would not interview someone under the influence of drugs or alcohol. In this case, he did not believe Defendant was under the influence of drugs or alcohol, nor did he believe the cold outside temperature had an effect on Defendant during the interview. Indeed, Detective Morel related that Defendant was not upfront, open or honest during the interview. To Detective Morel, this type of evasive conduct during an interview is consistent with a person understanding the interview process. Detective testified credibly that he did not threaten Defendant if he did not talk or promise Defendant anything if he did talk. He stated he had no concerns Defendant's statement was not given knowingly or voluntarily.

## II.  ANALYSIS

Defendant seeks to suppress the evidence seized on January 25, 2019, statements he made and any other derivative evidence. Dkt. 21, pp. 1-2. In support of this request, Defendant contends the search warrant is defective because it contained false and/or misleading information and the good faith exception in *Leon* does not apply; his warrantless arrest from the hotel room was unlawful; the eyewitness identification procedure used in the course of the investigation was suggestive and unreliable; and his statements to law enforcement were not the result of a knowing and intelligent waiver of his rights pursuant to *Miranda. Id.*, pp. 5-14.

The Government resists the motion in each particular. Dkt. No. 39. The Court addresses each of Defendant's arguments in turn.

### A. Search Warrant

The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be

seized.

U.S. Constitution. amend. IV.

The Court employs a totality of the circumstances analysis when determining if there is probable cause to issue a search warrant. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986); *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007). A magistrate judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him…there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238; *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995). On review, the Court "pay[s] 'great deference' to the probable cause determinations of the issuing judge or magistrate, and limit[s]…inquiry to discerning whether the issuing judge had a substantial basis for concluding that probable cause existed." *United States v. Butler*, 594 F.3d 955, 962 (8th Cir. 2010) *(citing Gates*, 462 U.S. at 236)).

Search warrants cannot be overly broad and must meet a standard of "practical accuracy." *United States v. Jansen*, 470 F.3d 762, 766 (8th Cir. 2006) (citing *United States v. Porter,* 831 F.2d 760, 764 (8th Cir.1987)) (citing *United States v. Johnson*, 541 F.2d 1311, 1313 (8th Cir. 1976)) (*citing United States v. Gomez*, 42 F.R.D. 347, 347 (S.D.N.Y. 1967)). "The constitutional standard for particularity of description in a search warrant dictates that the language be sufficiently definite to enable the searcher to reasonably ascertain and identify the place authorized to be searched and the things authorized to be seized." *Johnson*, 541 F.2d at 1313 (*citing Steele v. United States*, 267 U.S. 498, 503-04 (1925)).

Additionally, even if a search warrant is supported by probable cause, the warrant may be invalid if it is based on a flawed affidavit.

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks v. Delaware*, 438 U.S. 154, 155-156 (1978).

A *Franks* showing also applies to omissions from an affidavit. *Butler*, 594 F.3d at 961. The Court must void a search warrant if a defendant can show "(1) that the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading, and (2) that the affidavit if supplemented by the omitted information would not have been sufficient to support a finding of probable cause." *Reivich*, 793 F.2d at 961 (*citations omitted*); *Williams*, 477 F.3d at 557.

To be entitled to a hearing on this issue, a *Franks* hearing, a defendant must make a substantial preliminary showing that includes:

> allegations of deliberate falsehood or of reckless disregard for the truth [.][T]hose allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted ... is only that of the affiant, not of any nongovernmental informant.

*Franks,* 438 U.S. at 171.

Defendant argues the search of room 220 violated the Fourth Amendment because the search warrant was not supported by probable cause and the good faith exception to the exclusionary rule

does not apply in this case. Dkt. 21-1, pp. 5-9. Defendant contends the search warrant was defective

as the affidavit supporting it contained false and/or misleading information and failed to include

critical information. *Id.*, pp. 6-7. Specifically, Defendant suggests:

> the affidavit informs the judicial magistrate of an immediate concern with an
> individual involved in a domestic argument, having guns. However, the affidavit fails
> to include critical information concerning the status of that report. In fact, the
> presentation of the incident as a pending report is false. The incident had been cleared
> by police prior to the issuance of the warrant, and seemingly before the application
> was drafted.
>
> The initial complaint was unsubstantiated by the facts encountered by police.
> Responding officers did not find the 911 report to be accurate. As noted above, they
> were leaving the scene, planning no further action as to the initial call. This response
> was reasonable in light of the lack of corroborating evidence. They did not hear or
> observe any signs of a domestic disturbance. R.A. denied any issues and reported that
> she was trying to sleep. Her appearance and demeanor were consistent with that
> report. She became angry with the person she believed to be the complainant and told
> police the complainant was lying because he wanted her to return home. None of this
> information was contained within the warrant application, despite its obvious
> relevance to concerns with the room. Because of the obvious relevance of the
> information, the omission is at least reckless as to the accurate presentation of facts to
> the judicial officer.

*Id.*, p. 7. Absent the misleading report concerning the domestic argument, Defendant argues the

remaining facts contained in the search warrant affidavit are insufficient to establish probable cause.

*Id.* Defendant further asserts, because the insufficiency of probable cause is a direct result of law

enforcement's omissions and/or misrepresentations, the *Leon* good faith exception does not apply.

*Id.*, p. 9.

In response, the Government asserts Defendant is not entitled to a *Franks* hearing in the first

place, because he has not made the substantial preliminary showing that is required. Dkt. 39, p. 5.

The Government contends Defendant's claims that the "initial complaint was unsubstantiated" and

that the "presentation of the incident as a pending report [was] false" are not true. *Id.* Even if such

claims are true, Defendant has not shown the omissions were with the intent to make, or in reckless disregard of whether they made, the affidavit misleading. *Id.*

Even if he is entitled to *Franks* hearing, the Government argues Defendant must show both, that law enforcement omitted facts with the intent to make or in reckless disregards of whether they made the affidavit misleading and, that the affidavit, if supplemented by the omitted information would not support probable cause. *Id.*, p. 6. Here, if the affidavit is supplemented by the alleged omitted information, probable cause still exists, with no impact on the reviewing judge's finding. *Id.* Finally, the Government contends none of the four exceptions to the *Leon* good faith exception apply and the motion to suppress also should be denied due to such good faith reliance on the warrant. *Id.*, pp. 6-9.

This Magistrate Judge first addresses the Government's argument that Defendant has not demonstrated he is entitled to a *Franks* hearing in the first instance. Although a full evidentiary hearing was conducted, this Magistrate Judge notes it was necessary to do so based on the other issues raised by Defendant in his motion, as well as to ensure a full record was available to the District Judge reviewing this Magistrate Judge's report and recommendation. As such, it is appropriate to consider whether Defendant met his burden to establish an entitlement to a *Franks* hearing, even though, arguably, he already received such a hearing.

This Magistrate Judge finds Defendant has not made the required showing to entitle him to a *Franks* hearing. The only information supplied by Defendant in support of his request is in the form of a factual summary and argument provided in the brief in support of his motion. The brief indicates the factual summary "is based on discovery materials provided . . . including reports and supplied body camera footage." Dkt. 21-1, p. 2. This Court does not doubt the accuracy of this assertion but

notes that this falls short of the requirement that "[a]ffidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Frank,* 438 U.S. at 171.

"There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Id.* The substantiality requirement is not lightly met. *United States v. Wajda,* 810 F.2d 754, 759 (8th Cir. 1987). Although he details information he alleges was left out of the affidavit, Defendant fails to make a preliminary showing of a deliberate falsehood or reckless disregard for the truth. Lacking affidavits, offers of proof or other reliable statements, this Magistrate Judge finds Defendant's assertion in his brief that due to the "obvious relevance of the [omitted] information, the omission is at least reckless" falls short of the required showing. Dkt. 21-1, p. 7. Although the failure to include information and a reckless disregard for its consequences may be inferred from the fact that the information was omitted, for this inference to be valid, the defendant must show that the omitted material would be "'clearly critical' to the finding of probable cause." *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993); *Reivich,* 793 F.2d at 961(quoting *United States v. Martin,* 615 F.2d 318, 328 (5th Cir. 1980)). As set forth below, Defendant does not make this showing.

Even if he is entitled to a *Franks* hearing, this Magistrate Judge finds Defendant does not show law enforcement omitted facts with the intent to make or in reckless disregard of whether they made the affidavit misleading and, that the affidavit, if supplemented by the omitted information would not support probable cause. The Court finds the testimony of Detective Morel as to the affidavit he prepared for the search warrant to be credible. Detective Morel indicated he did not

know the officers were preparing to leave the scene at the QC Inn in relation to the 911 call. In addition, he indicated his reason for including the information on the 911 call was only to place Defendant at the scene in room 220. For these reasons, Defendant fails to meet his burden to show an intent to make the affidavit misleading or reckless disregard for the same.

Further, Defendant does not show that, if the affidavit is supplemented by the omitted information, probable cause does not exist for the issuance of the warrant. Although Defendant claims the initial 911 call was unsubstantiated and the presentation of the incident as a pending report in the affidavit was false, neither of these claims are true. Ms. Amling telling law enforcement nothing is wrong does make the initial 911 call unsubstantiated. Further, the affidavit does not present the incident as a "pending report", but merely lists the particulars of the 911 call and report itself. Defendant overstates the matter by claiming "the incident had been cleared by police prior to the issuance of the warrant". Dkt. 21-1, p. 7. Notwithstanding that it is not clear exactly what the phrase "cleared by police" means, nor was this phrase used by officers to describe what transpired, Officer Regan testified credibly that, although there was no cause to further the investigation of the 911 call, this did not mean there was not a gun in room 220. Further, he also indicated domestic calls typically unfold in this manner, with information changing throughout the course of the investigation. The officers had not even gotten into their squad cars before they received information to stay at the QC Inn until detectives arrived. The Court finds there is no information in the affidavit that is not correct – the affidavit correctly states what was reported by the caller of the 911 report.

Indeed, Defendant's real contention appears to be that additional information was omitted from the affidavit. In that instance, rather than removing information from the affidavit and examining whether probable cause would still exist as Defendant seems to suggest, the required

analysis is to *supplement* the affidavit with the omitted information and then examine it for probable cause. *See Reivich*, 793 F.2d at 961 (*citations omitted*); *Williams*, 477 F.3d at 557. When this Magistrate Judge adds the additional information to the statements in the affidavit, it finds probable cause for the issuance of the warrant still exists. Including the information Ms. Amling reported that nothing was wrong, that officers had no basis at that point to continue the investigation as to the 911 call, that she became very angry with the 911 caller, becoming very loud and angry talking to him while being questioned by the police such that they had to take her phone from her and that they observed no visible signs of a domestic incident does not remove probable cause.

As Officer Regan noted, it is not uncommon for stories to change in domestic incidents. Further, although Ms. Amling indicated she was fine, this does not mean what the 911 caller reported was not true or there was not a gun in the room. Indeed, as noted in the affidavit, Ms. Amling is alleged to have not been truthful to law enforcement previously, as she had an outstanding warrant for providing a false police report at the time of this incident. Further, her behavior in becoming very loud and angry while police were trying to assess the situation also adds to a lack of credibility to her report that everything was fine. Given nothing in the report from the 911 caller had been contradicted and most of the information had been confirmed – Ms. Amling was the person named, she was in the room at the location reported, the phone number given for her was correct – it was reasonable to conclude there was a gun in the room, as well. This is especially the case when considering her prior alleged false reports to police and loud and angry manner with the caller while she was being questioned by police. Given this, along with the report that Defendant was in room 220 and was recently identified as the shooting suspect in a prior shooting incident where the firearm was not recovered, there was probable cause for a search of the room for a firearm.

16

Finally, this Magistrate Judge also determines, in any event, the *Leon* good-faith exception to the exclusionary rule applies, as established in *United States v. Leon*, 468 U.S. 897 (1984). Under the good-faith exception, the court will not suppress evidence seized pursuant to a search warrant issued by a magistrate judge that is later determined to be invalid, if the executing officer's reliance upon the warrant was objectively reasonable. *Id.* at 922. The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006) (quoting *Leon,* 468 U.S. at 922, n.23).

*Leon* identified four situations in which an officer's reliance on a warrant would be unreasonable: (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable "; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid. *Leon*, at 923.

None of these four situations are present in this case. As set forth above, there is no evidence of false statements made knowingly, or with reckless disregard for the truth. Nor is there an assertion or evidence the reviewing judge abandoned her judicial role or the warrant is so lacking in probable cause to render reliance on it unreasonable. Finally, the warrant is not so deficient on its face that no officer could question its validity. There is no information presented by Defendant or the Government showing any officer had knowledge, either first hand or otherwise, the search was unconstitutional.

Indeed, in this case, this Magistrate Judge finds each officer acted in good faith. The officers testified to responding to a serious call regarding a gun, investigating to the best of their abilities and working with detectives to identify the parties involved due to an active warrant and an active investigation in which Defendant was a target. Importantly, Detective Morel testified to additional information, not included in the affidavit, known to him at the time of the search warrant request adding to probable cause – information from a social media post showing Defendant pictured with controlled substances and firearms. Although a reviewing court may not look to facts outside of the affidavit to determine probable cause, if the affidavit was deficient, the district court "'must look to the totality of the circumstances,' including any information known to the officers executing the warrant but not presented to the issuing judge." *United States v. Marion*, 238 F.3d 965, 969 (8th Cir. 2001) (quoting *United States v. Simpkins*, 914 F.2d 1054, 1057 (8th Cir. 1990)).

After considering the evidence presented herein and arguments of the parties, this Magistrate Judge recommends a finding Defendant did not meet his burden to be entitled to a *Franks* hearing; even so, he does not meet the standard under *Franks* to void the search warrant; probable cause exists for the issuance of the search warrant, even when considering omitted information; and, finally the *Leon* good-faith exception to the exclusionary rule applies.

## B. Entry into Room 220

The Fourth Amendment protects individuals against unreasonable searches and seizures by the government. *United States v. Williams*, 521 F.3d 902, 905 (8th Cir. 2008) (*see Minnesota v. Carter,* 525 U.S. 83, 88 (1998)). The ability "to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Id.* (quoting *Rakas v. Illinois,* 439 U.S. 128, 143

(1978)). In order to have a legitimate expectation of privacy, the defendant must show (1) a subjective expectation of privacy, and (2) the expectation is objectively reasonable. *Id.* at 905-906 (*see Carter,* 525 U.S. at 88)).

The Fourth Amendment prohibits law enforcement's warrantless and *nonconsensual* entry into the home to execute a routine felony arrest. *Payton v. New York*, 445 U.S. 573, 576 (1980). This protection from unreasonable seizure extends to one with the status of overnight guest. *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990). A constitutionally protected right to privacy must be a legitimate right to privacy. *Id*. at 95. A legitimate right to privacy is "one society is prepared to recognize as 'reasonable.'" *Id*. at 95-96 (quoting *Rakas*, 439 U.S. at 143). An overnight guest falls under this umbrella. *Id*. at 96-97. A hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office. *Hoffa v. United States*, 385 U.S. 293, 301 (1966) (citing *United States v. Jeffers*, 342 U.S. 48 (1951)).

Stemming from expectations of privacy is the question of whether evidence obtained from a violation of privacy should be excluded. The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search (*Weeks v. United States,* 232 U.S. 383 (1914)), and of testimony concerning knowledge acquired during an unlawful search, (*Silverman v. United States,* 365 U.S. 505 (1961)). *Murray v. United States*, 487 U.S. 533, 536 (1988). "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *United States v. McManaman*, 673 F.3d 841, 846 (8th Cir. 2012) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984) (citations omitted)).

Inevitable discovery is an exception to the exclusionary rule. To have evidence that was obtained after a constitutional violation admitted into court, the government must show it was not obtained "by exploitation of that illegality [but] instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (quoting *Wong Sun v. United States,* 371 U.S. 471, 488 (1963)). Evidence is purged of taint and should not be suppressed "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id.* (quoting *Nix v. Williams,* 467 U.S. 431, 444 (1984)). The inevitable discovery exception applies when the government proves "by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. McManaman,* 673 F.3d 841, 846 (8th Cir. 2012) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)).

Defendant argues his warrantless arrest was unconstitutional and all derivative evidence should be suppressed. Dkt. 21-1, pp. 9-11. He contends law enforcement entered his room to arrest him and did not have a warrant to do so. *Id.* p. 10. He claims, although he "unlatched the door", it was not by consent. *Id.* Further, officers discussed a ruse to lure him out of the room, planned to grab him after he was lured out of the room and even contemplated fighting him if fought. *Id.* p. 11. He was immediately detained and transported to the police department for an interview. *Id.* For these reasons, Defendant contends the "police misconduct was purposeful" and this evidenced a "calculated decision to circumvent warrant requirements." *Id.*

Defendant also contends a destruction of evidence exigency to permit entry into the room was not present in this case. Dkt. 43, p. 2. Among other reasons, he asserts this situation involved stale information – relating to an incident that occurred in October 2018. *Id.* p. 3. The discussions of the officers, as reflected in the body camera videos, relate purely to the arrest of Defendant, not the destruction of evidence. *Id.* p. 4. Further, firearm evidence is not readily destroyed. *Id.* p. 5.

In response, the Government asserts the warrantless arrest of Defendant was proper. Dkt. 39, pp. 9-11. The Government contends Defendant voluntarily opened the door to his motel room upon a simple knock from law enforcement, so the entry and his detention was not unreasonable. *Id.* pp. 9-10. Additionally, the Government asserts law enforcement was seeking a search warrant at the same time and, therefore, properly entered the room to prevent the destruction of evidence. Dkt. 40, pp. 1-3. The Government maintains even if Defendant did not voluntarily open the door, the inevitable discovery exception to the exclusionary rule applies. Dkt. 39 pp. 10-11.

Defendant's status in the room - whether he was an overnight guest, with an expectation of privacy, or a mere visitor, without such expectation of privacy, is not clear from the facts or the parties' briefs. However, Detective Robinson testified he spoke to the occupant of the room next door – room 219, who told him Defendant had been at room 220 for several days. Further, neither party disputes his status as an overnight guest. Accordingly, this Magistrate Judge finds Defendant had a constitutionally protected right to privacy in room 220.

Turning to the question of the circumstances surrounding the officers' entry into room 220 and subsequent detention of Defendant, this Magistrate Judge has considered all of the testimony and evidence presented, including viewing each body camera video submitted by both parties.  Prior to Officer Ellerbach arriving at the scene, Officers Regan, Dinneweth and Luna all interact with

Defendant, so he is aware of their presence. After the officers leave with Ms. Amling, Officers Dinneweth and Luna return to room 220 and knock on the door and engage in loud conversation with Defendant so, again, Defendant knows officers are still present. This encounter could be fairly described as loud, demanding and commanding his exit.  Defendant does not exit or open the door in response to any such commands. Officer Regan instructs Officers Dinneweth and Luna to back away, both from the door and as to such attempts to engage Defendant.

Approximately three to five minutes after that engagement has ended, Officer Regan, along with several other officers and detectives, approach room 220 again. Although there had been discussion of using a ruse to get Defendant to open the door and come out, that never occurs. Rather, Officer Regan knocks on the door in a "normal" manner. The video shows the knock to be consistent with his testimony – it was not a "police knock." The door opens as Officer Regan says, in a non-threatening tone, words to the effect of "hey man, sorry man, Raynesha is out here …". At the same time, Defendant opens the door, steps slightly back, while raising his arms. There was no demand made to enter and it certainly appears from the video Defendant voluntarily opened the door to room 220.  The officers did not enter with a display of force or otherwise in a coercive manner. They did not demand or obtain entry under authority of law.

This conclusion is also reached because he did not open the door previously, when demanded by Officers Dinneweth and Luna. Accordingly, by opening the door this time, it can be construed Defendant knew what he was doing and was doing so voluntarily. Further, plans discussed by the officers to get Defendant out of room 220 that contemplated using a ruse or fighting Defendant if necessary, do not demonstrate a calculated decision to circumvent warrant requirements. Rather, the search warrant was being discussed and applied for at the same time and, in fact, the plans were

never used. Based on all of this, this Magistrate Judge determines the entry was not unreasonable, rather, it was with the consent of Defendant.

Additionally, even if the warrantless entry was unreasonable, the Government has shown the inevitable discovery doctrine prevents evidence from being suppressed. At the time of their entry, officers were already pursuing a search warrant for firearms and evidence related to firearms possession thereby actively pursuing an alternative line of investigation and were waiting at the scene for word of its issuance. During this time, until the search warrant was issued, either Defendant would have left the room voluntarily and then been detained or Defendant would have been detained upon law enforcements' entry following the approval of the search warrant. Under either series of events, the same evidence would have been discovered.

The Government also contends the entry was appropriate as law enforcement entered the room to prevent Defendant from destroying contraband inside of room 220. Dkt. 40. Although the officers provided testimony there is always a general concern about destruction of contraband or evidence, this Magistrate Judge does not believe this was a specific concern for the officers that day. This Magistrate Judge has reviewed each of the body camera and squad car camera videos presented as evidence. It is evident from a review of those videos, the officers did not raise destruction of contraband or evidence as a concern. Instead, the main focus was on Defendant, himself, as the subject of pending charges, as well as securing the search warrant. In any event, based on the above recommendation, the Government's contention as to this issue is irrelevant.

After considering the evidence presented herein and arguments of the parties, this Magistrate Judge recommends a finding that the warrantless entry into his room was with consent and proper; alternatively, even if not with consent and proper, the Government has shown by a preponderance of

evidence the inevitable discovery doctrine applies, and the evidence recovered should not be excluded.

### C. Eyewitness Identification

For identification evidence admissibility, the court applies a two-part test. *United States v. Mshihiri*, 816 F.3d 997, 1008 (8th Cir. 2016) (citing *United States v. Williams,* 340 F.3d 563, 567 (8th Cir. 2003)). First, the court determines if the identification procedures were "impermissibly suggestive." *Williams* at 567 (citing *Simmons v. United States,* 390 U.S. 377, 384 (1968)). On more than one occasion, the Eighth Circuit has indicated that the use of a single-photograph to identify a suspect are considered impermissibly suggestive. *See Sanchell v. Parratt*, 530 F.2d 286, 294 (8th Cir. 1976); *United States v. Murdock*, 928 F.2d 293, 297 (8th Cir. 1991); *United States v. Patterson*, 20 F.3d 801, 806 (8th Cir. 1994).

If they were found to be impermissibly suggestive, the court then examines the totality of the circumstances to determine whether the suggestive procedures created "a very substantial likelihood of irreparable misidentification." *Williams* at 567 *(*citing *Simmons,* 390 U.S. at 384); *see also Manson v. Brathwaite,* 432 U.S. 98, 113 (1977) (reaffirming totality-of-circumstances standard rather than exclusionary rule). In determining the likelihood of misidentification, the court considers five factors - "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Mshihiri* at 1008-09 (quoting *Manson v. Brathwaite,* 432 U.S. 98, 114 (1977)).

Defendant argues the eyewitness identification procedure was suggestive, unreliable and should be suppressed. Dkt. 21-1, pp. 11-13. Defendant contends only a single photo was presented to

the witness and such isolation of Defendant influenced the identification. *Id.* p. 12. Further, the totality of the circumstances does not suggest reliability of the identification. *Id.* p. 13. Specifically, Defendant contends the witness had a brief interaction with Defendant, did not provide feedback to the level of confidence as to the identification and it was made a few days after the witness had seen the Defendant. *Id.*

In response, the Government asserts that, even if the single-photograph identification was impermissibly suggestive, given the totality of the circumstances, the use of a single photograph was not likely to create a substantial likelihood of irreparable misidentification. Dkt. 39, pp. 11-12. The Government contends the witness had "ample opportunity to view the [D]efendant prior to being shown the photograph in question. The interaction [the witness] had with the [D]efendant outside her motel room was not during a time of great stress. There was no imminent harm. The [D]efendant was not threatening [the witness] or otherwise victimizing [the witness]. [The witness] made the identification within a few days of the interaction with the [D]efendant." *Id.*, p. 12.

This Magistrate Judge agrees with the Government's contentions that, based on the totality of the circumstances, the witness provided a reliable identification. The witness had interacted with Defendant and an individual with him only a few days prior outside their respective rooms at the QC Inn. Detective Robinson related the witness met with Defendant, questioning him about the bullet hole in the wall between their rooms. The witness reported Defendant inquired as to whether she was all right and the individual with Defendant indicated the hole was from a BB gun. The witness identified the other person with Defendant by name. In addition, the witness indicated Defendant allowed her to use the phone in room 220 to contact the front desk. Detective Robinson testified he showed the witness a mug shot photo of Defendant on his colleague's cell phone. He stated the

witness indicated without hesitation the mug shot photo of Defendant showed the male she spoke to a few days prior. The reliability of the identification made by the witness overrides any suggestive nature of the use of a single photograph.

Accordingly, this Magistrate Judge recommends a finding that, under the totality of the circumstances, the single photograph used in this case was not likely to create a substantial likelihood of irreparable misidentification.

### D. Admissibility of Defendant's Statements

Under *Miranda,* a suspect in custody must be advised as follows:

> [h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona,* 384 U.S. 436, 479 (1966).

The right to counsel in such a situation is necessary, the court concluded, because custodial police interrogation of an accused, "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467. Therefore, statements made during custodial interrogation are inadmissible unless the suspect is specifically warned of his *Miranda* rights and freely decides to forego those rights. *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989) (quoting *New York v. Quarles*, 467 U.S. 649, 654 (1984)).

A suspect may waive his/her rights if the waiver is made voluntarily, knowingly and intelligently. *Miranda,* 384 U.S. at 444.  "[A] waiver is 'voluntary' where the court can determine that the waiver was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or deception." *Thai v. Mapes,* 412 F.3d 970, 977 (8th Cir. 2005) (citing

*Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "A waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right." *Id.* The government "need prove waiver only by a preponderance of the evidence." *Colorado v. Connelly,* 479 U.S. 157, 168 (1986). Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citing *Fare v. Michael C.,* 442 U.S. 707, 725 (1979)). *See also North Carolina v. Butler,* 441 U.S. 369, 374–75 (1979).

When determining whether a Defendant's statement is admissible, a court must consider whether, prior to interrogation and while in custody, Defendant waived his *Miranda* rights voluntarily, knowingly and intelligently.

Defendant argues his statement should be suppressed because it was taken in violation of his *Miranda* rights. Dkt. 21-1, pp. 13-14. He contends his mental capacity at the time of the interrogation did not allow for a knowing and intelligent waiver of his rights. *Id.* p. 14. He further asserts,

> [h]is demeanor and behavior suggested he was under the influence of a substance, emotional distress and/or both. The interview followed [Defendant's] warrantless arrest by police. During that contact, he repeatedly inquired about the basis for his arrest and requested to see relevant documentation. He was then transported to the police department in a squad car. His behavior suggested both discomfort and impaired cognitive functioning. Indication of distress continued during his detention in the interrogation room.

*Id.*

Under these circumstances, Defendant contends the Government cannot prove he voluntarily waived his *Miranda* rights. *Id.*

In response, the Government asserts none of the facts tend to show Defendant's will was overborne:

[t]he [D]efendant was twenty four years old. He completed the 11th grade. There is nothing to suggest that his mental capacity is impaired and he does not make that argument. The [D]efendant was advised of his rights by police and he acknowledged his understanding of those rights in writing. He waived those rights and expressed a willingness to speak with officers. Importantly, he exercised his own discretion when choosing whether to answer certain questions and not answer others. He was, at times, evasive. That shows his appreciation for the jeopardy he may have been in and a knowing decision to be evasive. The interaction with police began in his hotel room on a very cold day. At the time the [D]efendant first encountered the police, he was not wearing a shirt. Prior to being transported to the police station, however, and contrary to his suggestion in his motion, officers provided him a sweatshirt and he was wearing a stocking hat. Importantly, and unsurprisingly, upon his arrival at the Davenport police station, the building was properly heated. The interview with the [D]efendant occurred in a police station interview room and was recorded. The officers made no threats or promises. The circumstances surrounding the interaction simply do not support the [D]efendant's conclusion that the statements were not made voluntarily.

Dkt. 39, pp. 14-15.

This Magistrate Judge agrees with the Government's contentions Defendant's will was not overborne and he voluntarily and knowingly waived his *Miranda* rights when he made statements to officers. Using a totality of the circumstances analysis, the facts in this case do not show Defendant's will was overborne or impacted by any impairment. Defendant was in custody, but he was advised of his *Miranda* rights and he acknowledged his understanding of those rights in writing prior to giving his statement. Defendant waived his *Miranda* rights and expressed a willingness to speak with officers.

Both parties agree the temperature on January 25, 2019 was extremely cold. When Defendant first met with the police at room 220, he was not wearing a shirt.  Prior to being transported to the police station, officers provided Defendant a sweatshirt zip up jacket and he was wearing a knit stocking hat, a pair of pants, a pair of shorts and shoes. In Defendant's Exhibit F, the squad car video shows Defendant was cold, but was in conversation with officers throughout the ride to the police

station. During the transport, the officers turned up the heat in the police squad car and opened the guard shield to allow the heat to get to the back to Defendant faster. The officers also stopped during the transport to adjust the sweatshirt zip up jacket by zipping it up for Defendant to help him stay warm. Defendant tells the officers he does not want to go to the hospital. He jokes with the officers about people going slow when a police car is behind them and about one of the officer's glasses. He can get in and out of the police car without difficulty.

Once inside the Davenport police station, the building was heated. The interview with Defendant occurred in a police station interview room and was recorded. The officers made no threats or promises. In Government's Exhibit 1, Defendant's interview video, it is clear Defendant was in control of his mental state. He gives his identification information. He asks multiple times about the search warrant and specific sections of the search warrant. Furthermore, he yells at Ms. Amling, in a room next door, not to talk to the officer multiple times. He uses the term "baby mama" and "Raynesha" when yelling at her.

Defendant was twenty-four years old and had completed the eleventh grade. Importantly, Defendant exercised his own discretion when choosing whether to answer certain questions and not answer others. Detective Morel testified as to his interview of and interaction with Defendant. He confirmed he read through the *Miranda* form with Defendant and Defendant had no issues doing so. Detective Morel testified credibly Defendant was able to follow along as he read him the *Miranda* form, he printed his correct initials on it, he placed the initials on the lines, and he was quick to respond he completed the eleventh grade. In Detective Morel's opinion, if Defendant was under the influence, he was not exhibiting signs of it and he would not have been able to perform the basic tasks to complete and sign the *Miranda* form. Detective Morel felt, because he was evasive at times,

this showed Defendant's appreciation for the jeopardy he was in at the time and a lack of impairment. Detective Morel confirmed no threats or promises were made in order to get Defendant to speak. It was completely Defendant's decision to speak, and Detective Morel credibly stated he would have stopped the interview if he believed it was not voluntary.

Accordingly, this Magistrate Judge recommends a finding that, under the totality of the circumstances, Defendant's statement was given knowingly, intelligently and voluntarily.

### RECOMMENDATION AND ORDER

IT IS RESPECTFULLY RECOMMENDED, Defendant's Motion to Suppress Evidence and Request for Evidentiary Hearing (Dkt. No. 21) be denied.

IT IS ORDERED, the parties shall have until October 29, 2019 to file written objections to the Report and Recommendation, pursuant to 20 U.S.C. § 636(b)(1), Fed. R. Crim. P. 59(b)(2), and L.Cr.R. 59.

**IT IS SO ORDERED.**

**DATED** this 15 day of October 2019.


_____
STEPHEN B. JACKSON, JR.
UNITED STATES MAGISTRATE JUDGE